**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**CENTRAL ARKANSAS CONTRACTORS, INC. PLAINTIFF**

**v. CASE NO. 4:25-cv-1252-DPM**

**CITY OF HELENA-WEST HELENA, ARKANSAS; JOSEPH WHITFIELD, Mayor, individually and in his official capacity; JOE ST. COLUMBIA, City Director, individually and in his official capacity; MAXINE MILLER, City Director, individually and in her official capacity; DON ETHERLY, City Director, individually and in his official capacity; ADRIAN MESSINA, City Director, individually and in his official capacity; KYLE MILLER, City Director, individually and in his official capacity; and MONICA DAVIS, City Director, individually and in her official capacity DEFENDANTS**

# PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

This is a collection case in which every material witness—including the City's own officers—agrees the debt is owed. From early 2023 into 2025, Central Arkansas Contractors, Inc. ("CAC") rented heavy equipment to the City of Helena-West Helena and performed road, drainage, demolition, and landfill work at the City's request. The City's landfill was under a consent administrative order with the Arkansas Department of Environmental Quality, its own equipment did not run, and no ordinary vendor would extend it credit. CAC kept the landfill open and the streets repaired. The City took the equipment, took the work, took the benefit—and did not pay.

The former Mayor testified he personally authorized every rental and every job, received CAC's written demand, and "felt it was legitimate." The City Council waived competitive bidding by ordinance, approved specific rentals in open meetings, and voted to pay $93,945 of CAC's bills. The City Clerk texted CAC's Vice President that "it looks like we owe you about $165,000," and the City Treasurer testified, "we owe them the money." The current Mayor could not identify a single disputed invoice and agreed that "[a]ny city should pay its debts." No official has ever identified a false invoice, an unauthorized project, or defective work. The only explanations for nonpayment in this record are that the City was "financially embarrassed" and that one council member wanted CAC "paid last." Neither is a defense. CAC is entitled to partial summary judgment against the City for $276,675.66.

Record citations. Plaintiff submits a single Bates-numbered Rule 56 Exhibit Book containing Exhibits 1 through 11. Bates numbers run CAC-SJ-000001 through CAC-SJ-000221 and provide the stable page locator used in this Brief. Exhibits 1 through 6 are the deposition excerpts of Franklin (CAC-SJ-000004–000027), Valley (CAC-SJ-000028–000054), Turner (CAC-SJ-000055–000069), Whitfield (CAC-SJ-000070–000104), Ramsey (CAC-SJ-000105–000117), and Robinson (CAC-SJ-000118–000124). Exhibit 7 is Mark Jackson's declaration and attachments (CAC-SJ-000125–000163); Exhibits 8 through 10 are the City and Whitfield discovery responses (CAC-SJ-000164–000214); and Exhibit 11 is Mark G. Jackson's affidavit (CAC-SJ-000215–000221).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is "not a disfavored procedural shortcut, but rather an integral part of the Federal Rules

as a whole." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," and "[t]he mere existence of a scintilla of evidence" is insufficient. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted). Under Local Rule 56.1(c), all material facts set forth in CAC's Statement of Undisputed Material Facts ("SUF") are deemed admitted unless controverted by the City's responsive statement. Rule 56(c)(1)(A) permits the movant to support an undisputed fact with particular parts of the record, including depositions, documents, admissions, and interrogatory answers, and Rule 56(c)(4) requires a supporting declaration to be based on personal knowledge, set out facts admissible in evidence, and show the declarant's competence. If the Court does not grant all relief requested, Rule 56(g) authorizes an order stating any material fact or damages component that is not genuinely disputed and treating it as established in the case.

## III. ARGUMENT

### A. The Undisputed Facts Establish Every Element of Breach of Contract.

Under Arkansas law, a breach-of-contract claim requires "the existence of a valid and enforceable contract between the plaintiff and defendant, the obligation of defendant thereunder, a violation by the defendant, and damages resulting to plaintiff from the breach." Ballard Grp., Inc. v. BP Lubricants USA, Inc., 2014 Ark. 276, at 7–8, 436 S.W.3d 445, 450. Each element is established without genuine dispute.

Agreement and obligation. The City's department heads requested the equipment; the rates were fixed and known up front—$6,700 per month for the excavator, approximately

$16,000 per month for the articulated truck—and were at or below market. (SUF ¶¶ 7–9.) Mayor Franklin, whom Arkansas law vests with the "exclusive power and responsibility" to make purchases and "all necessary contracts for work or labor" for the City, Ark. Code Ann. § 14-58-303(a), personally authorized every rental and every project:

> Q. All right. And so all the work that Central Arkansas Contractors did for the city, did you authorize that, sir?
> A. I did.
> Q. Okay. And were there city department heads that requested equipment from Central Arkansas Contractors?
> A. They did.
> Q. And did the city council authorize Central Arkansas Contractors' work if it was over $5,000?
> A. They did.
> Q. And did the city council approve payments to Central Arkansas Contractors?
> A. They did.

(Ex. 1, Franklin Dep. 12:2–14, CAC-SJ-000013.) The Council approved the rentals in its own minutes—the excavator (March 7, 2023), the dozer (June 6, 2023), and two dump trucks (July 18, 2023)—approved the landfill rentals monthly for a period, waived competitive bidding and authorized the Mayor to contract by Ordinance No. 01-2024, and on April 2, 2024 voted to pay $93,945 of CAC's accrued bills. (SUF ¶¶ 11–15; Ex. 1, Franklin Dep. 26:9–16, CAC-SJ-000027; Ex. 7-G, CAC-SJ-000150–000151; Ex. 7-H, CAC-SJ-000153–000160.) See Ark. Code Ann. § 14-58-303(b)(2)(B) (governing body may waive competitive bidding).

Performance. CAC furnished the equipment and did the work—"for months on end," at the landfill, on at least seven named streets, and in the City's parks, photographed by a City employee at the Chief of Staff's direction and posted on the City's own Facebook page. (SUF ¶ 16.) The work was necessary, in the public interest, and of good quality; the landfill could not have operated without it. (SUF ¶ 17.) No official ever identified a false invoice, overbilling, unauthorized work, or any problem with the work. (SUF ¶ 19.) The City's own Rule 36

responses admit that CAC provided equipment-rental services in 2023 and that the City used CAC equipment in 2023. (Ex. 9, RFA Nos. 1–2, CAC-SJ-000196–000197.)

Breach. The invoices were received, reviewed, and found "consistent with the work done and the equipment used"—and left unpaid, except for partial payments made "as funds were available." (SUF ¶¶ 18–20.) The reasons were lack of money and a council member's wish that CAC be "paid last"—not any dispute. (SUF ¶¶ 20–21.) Mayor Franklin received CAC's June 4, 2025 demand and did not dispute it:

> Q. And you received the letter. Did you dispute the debt at all, or did you feel it was a legitimate debt?
> A. I felt it was legitimate, because any work that they did I would have to approve it.

(Ex. 1, Franklin Dep. 13:25–14:4, CAC-SJ-000014–000015.) The City's Treasurer—the official who refused to sign the checks—conceded the bottom line:

> Q. . . . [I]f you're the city, and you get equipment, and even personnel to operate in that landfill from Central Arkansas Contractors, even if you don't have the money in the landfill fund or the sanitation fund or whatever it is, you still owe the money, don't you?
> A. Yes.
> Q. Okay.
> A. The people providing the services, they presented us an invoice, and we owe them the money.

(Ex. 3, Turner Dep. 12:19–13:4, CAC-SJ-000063–000064.) And the current Mayor agreed: "Q. Okay. Should the city pay its debts? A. Yes. Any city should pay its debts." (Ex. 4, Whitfield Dep. 43:1–2, CAC-SJ-000104.)

Damages. The unpaid balance is $276,675.66—the $228,938.20 open account plus the $47,737.46 balance of the bulldozer repair. (SUF ¶¶ 22, 32–37; Ex. 7, Jackson Decl. ¶¶ 11–12, CAC-SJ-000128.) Every element of breach of contract is therefore established by the City's own witnesses and records.

**B. The Rentals Were Authorized—and Arkansas Law Does Not Let a City Keep the Benefits and Refuse to Pay in Any Event.**

The only "defense" surfaced in discovery is Treasurer Turner's assertion that he found no council minute approving over-$5,000 payments "from general funds," and current Mayor Whitfield's suspicion—based, by his own admission, on no personal knowledge of anything—that some invoices "never made their way to the city council table." (Ex. 3, Turner Dep. 17:23–18:10, CAC-SJ-000068–000069; Ex. 4, Whitfield Dep. 11:7–16, 12:2–10, CAC-SJ-000072–000073.) That is no defense, three times over.

First, the record of authorization is express and documentary: the Council's own minutes approving the excavator, dozer, and dump-truck rentals; monthly approvals of the landfill rentals; Ordinance No. 01-2024 waiving competitive bidding and authorizing the Mayor to contract for the Word Street, Valley Drive, and landfill work while specifically referencing CAC's invoices; and the April 2, 2024 vote to pay $93,945. (SUF ¶¶ 10–15; Ex. 1, Franklin Dep. 26:9–16, CAC-SJ-000027; Ex. 7-G, CAC-SJ-000150–000151; Ex. 7-H, CAC-SJ-000153–000160.) No one has ever claimed the ordinance is invalid. (SUF ¶ 14.) The Mayor's statutory purchasing power did the rest. Ark. Code Ann. § 14-58-303(a).

Second, which internal fund the City draws upon—general fund, street fund, or landfill fund—is the City's bookkeeping, not an element of CAC's claim. Turner himself admitted the Council approved the landfill invoices, and that regardless of fund, "we owe them the money." (Ex. 3, Turner Dep. 12:11–13:4, CAC-SJ-000063–000064.)

Third, and dispositively, the Arkansas Supreme Court has squarely held that a city that receives and retains benefits under a contract that was defective—even illegal—must pay for them. In City of Damascus v. Bivens, 291 Ark. 600, 726 S.W.2d 677 (1987), the city took water-

system improvements under a contract void for noncompliance with the bidding statute; the court affirmed judgment for the contractor, holding that "the unjust enrichment principle is firmly embedded in Arkansas law in the context of work performed pursuant to illegal contracts made by political subdivisions such as cities," and that the contract price is "some evidence of the value of the benefit conferred." Id. at 603–05, 726 S.W.2d at 679. Likewise, in McCuistion v. City of Siloam Springs, 268 Ark. 148, 594 S.W.2d 233 (1980), the court held that a city's failure to formally authorize a contract "does not preclude a recovery," because "a party cannot retain the benefits of a defective contract and at the same time avoid paying for these benefits." Id. at 152, 594 S.W.2d at 235. Even Mayor Whitfield conceded the point:

> Q. So are you saying that if it didn't go before the city council, y'all should get to use it for over a year free?
>
> MS. MONAGHAN: Objection to form.
>
> A. No.

(Ex. 4, Whitfield Dep. 16:23–17:2, CAC-SJ-000077–000078.)

Accordingly, if any portion of the account were somehow found to lack proper approval, the result is not a windfall to the City; it is restitution measured by the agreed rates. CAC pleads unjust enrichment in the alternative, and "the mere existence of a contract between the parties does not automatically foreclose a claim of unjust enrichment." Campbell v. Asbury Auto., Inc., 2011 Ark. 157, at 23, 381 S.W.3d 21, 36. Unjust enrichment lies where a party "has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain." Hatchell v. Wren, 363 Ark. 107, 116–17, 211 S.W.3d 516, 521–22 (2005). Unlike in Sanders v. Bradley County Human Services Public Facilities Board, 330 Ark. 675, 956 S.W.2d 187 (1997), where the quantum-meruit claim failed for want of proof that the county received or used the benefit, here the City's receipt, use, and retention of CAC's equipment and

work are established by the City's own officers, employees, minutes, photographs, and Facebook posts. (SUF ¶¶ 16–17, 38.)

**C. The Amount Due Is Established and Unrebutted.**

CAC's statement of account itemizes every invoice, every credit, and every partial payment, and shows an open balance of $228,938.20 as of June 2, 2025—the same figure demanded in writing on June 4, 2025 and never questioned. (SUF ¶¶ 22–24; Ex. 7-A, CAC-SJ-000131; Ex. 7-B, CAC-SJ-000133–000135.) The City's own officers corroborate the account: the Clerk's contemporaneous text—"I ran a tape yesterday, and it looks like we owe you about $165,000"—was based on her review of City records. (Ex. 5, Ramsey Dep. 6:20–7:11, CAC-SJ-000107–000108; Ex. 7-F, CAC-SJ-000146–000148.) She also confirmed that invoices totaling $186,466 had been kept in her office and that her prior testimony reflected an account balance in the neighborhood of $233,983.20 as additional invoices and equipment-damage charges accrued. (Ex. 5, Ramsey Dep. 8:1–9:21, CAC-SJ-000109–000110; SUF ¶ 25.) When asked in discovery to state the amount the City contends it owes, the City answered: "I do not know." (Ex. 8, Interrog. No. 3, CAC-SJ-000166; SUF ¶ 28.)

A party cannot defeat summary judgment with "I do not know." Once CAC supported each fact with record evidence, the City was obliged to come forward with specific facts showing a genuine dispute; metaphysical doubt, suspicion, and professed ignorance do not suffice. Torgerson, 643 F.3d at 1042; Anderson, 477 U.S. at 252; Fed. R. Civ. P. 56(c), (e). The only quibble any witness offered—Treasurer Turner's remark that some rental invoices billed the coming month—is not evidence of falsity: billing a month-to-month rental at the start of the month is how rent works; Turner conceded CAC presented no false invoices; and he acknowledged the landfill invoices were "always for the month that had previously occurred."

(Ex. 3, Turner Dep. 13:5–8, 14:12–16, CAC-SJ-000064–000065.) At an absolute minimum, the $93,945 the Council itself voted to pay on April 2, 2024 is beyond any possible dispute. (SUF ¶ 15; Ex. 1, Franklin Dep. 26:9–16, CAC-SJ-000027.)

The City and Mayor Whitfield's written responses to CAC's Amended Second Requests for Admission confirm the same thing in a different register. Exhibit 12. Asked to admit the Council's own April 2, 2024 vote to pay $93,945; that the City rented and returned a damaged excavator; that it made $6,700-per-month partial payments for that excavator; and that it rented the bulldozer for $3,995 per month, they did not deny a single one of these facts. They answered "I don't know" to each—without stating, as Fed. R. Civ. P. 36(a)(4) requires, that reasonable inquiry had been made and that the information needed to admit or deny was unavailable. (Ex. 10, RFA Nos. 44, 71, 73, 75, CAC-SJ-000207, CAC-SJ-000212; SUF ¶ 31.) A defendant cannot manufacture a genuine dispute over its own governing body's recorded vote, or its own equipment's rental rate, by disclaiming knowledge of its own records. Anderson, 477 U.S. at 252. What they did admit is equally telling: CAC was the low bidder on the Hernando Street drainage project as recently as April 30, 2026, and the Mayor's spending authority is $5,000 per transaction. (Ex. 10, RFA Nos. 74, 82, CAC-SJ-000212–000213; SUF ¶ 30.) These admissions and non-denials independently reinforce the documentary and testimonial record establishing authorization, performance, and nonpayment.

**D. The Bulldozer-Repair Balance Is Part of the City's Debt.**

The bulldozer was damaged in the City's hands because a City employee "ran it hot" and failed to maintain it—former Mayor Franklin and former Chief of Staff Valley both said so, and Franklin agreed the equipment "wasn't used properly" and was "damaged as a result." (SUF ¶ 32; Ex. 1, Franklin Dep. 15:4–16:2, 17:5–8, CAC-SJ-000016–000018; Ex. 2, Valley Dep. 17:2–

18:5, CAC-SJ-000041–000042.) Stribling Equipment's repair records total $49,867.13, billed to the City's own street department. (SUF ¶ 33; Ex. 7-D, CAC-SJ-000139–000143.) Mayor Franklin authorized the repairs, and the City part-performed that obligation—paying $2,129.67 to Stribling by Street Fund check no. 2363—and then simply stopped. (SUF ¶¶ 34–35; Ex. 7-E, CAC-SJ-000145.) No witness offers any competing account of causation, authorization, or amount; the Treasurer admitted he has no personal knowledge contradicting any of it. (Ex. 3, Turner Dep. 15:1–13, CAC-SJ-000066.) The $47,737.46 balance is recoverable on the same contractual and restitutionary grounds as the rest of the account: the City took a working bulldozer, returned a broken one, authorized and part-paid the repair, and kept the benefit of both the machine and the repair. Damascus, 291 Ark. at 603–05, 726 S.W.2d at 679; McCuistion, 268 Ark. at 152, 594 S.W.2d at 235.

**E. Rule 56(g) Provides a Clean Alternative if the Court Finds a Triable Issue as to Any Damages Component.**

Rule 56 does not force an all-or-nothing choice. If the Court concludes that a genuine dispute remains as to the full $276,675.66 figure, or as to the treatment of the bulldozer-repair component, Rule 56(g) permits the Court to establish the liability facts and amounts that the record leaves beyond genuine dispute. Those facts include, at minimum, that the City requested and received CAC's equipment and work; Mayor Franklin authorized the work; the Council approved specific rentals and waived competitive bidding for identified CAC work; the Council voted to pay $93,945 in accrued CAC bills; the City made partial payments; the Treasurer testified that the City owed the money; and no witness identified a false invoice, unauthorized project, or defective work. (SUF ¶¶ 7–28; Ex. 1, Franklin Dep. 26:9–16, CAC-SJ-000027.) At an absolute minimum, the Council's own $93,945 payment authorization can be treated as

established. A Rule 56(g) order would narrow any trial to only the genuinely disputed component rather than require the parties to retry facts the City's own witnesses and records already establish.

**F. CAC Is Entitled to Prejudgment Interest, Costs, Attorneys' Fees, and Post-Judgment Interest.**

Prejudgment interest is recoverable where damages are ascertainable by mathematical computation from the evidence, and "[w]here prejudgment interest may be collected at all, the injured party is always entitled to it as a matter of law." Ozarks Unlimited Res. Coop., Inc. v. Daniels, 333 Ark. 214, 221–22, 969 S.W.2d 169, 172–73 (1998) (unpaid lease rentals). Fixed monthly rental rates and a fixed repair invoice are precisely such damages, even where the amounts accrued over time. See All-Ways Logistics, Inc. v. USA Truck, Inc., 583 F.3d 511, 517–20 (8th Cir. 2009) (affirming Arkansas prejudgment interest on amounts accruing in varying monthly sums). CAC is also entitled to a reasonable attorney's fee as prevailing party on its contract claim under Ark. Code Ann. § 16-22-308, which applies to Arkansas contract claims in federal court. All-Ways Logistics, 583 F.3d at 520–21. CAC will submit its fee petition after judgment. Any money judgment also bears post-judgment interest at the federal statutory rate under 28 U.S.C. § 1961(a).

## IV. CONCLUSION

The City's former Mayor authorized the debt and called it legitimate. Its Council approved the rentals, waived bidding, and voted to pay. Its Clerk tallied it. Its Treasurer admitted it. Its current Mayor cannot identify a disputed invoice and agrees cities should pay their debts. The Court should grant partial summary judgment against the City of Helena-West Helena for $276,675.66, with prejudgment interest, taxable costs, attorneys' fees under Ark. Code Ann. §

16-22-308, and post-judgment interest under 28 U.S.C. § 1961. Alternatively, the Court should enter a Rule 56(g) order establishing the City's liability and every damages component not genuinely disputed, leaving only any genuinely disputed component and CAC's remaining claims for trial.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C.**
310 Natural Resources Dr., Suite 2
Little Rock, AR 72205
Phone: 501-315-1910 | Fax: 501-315-1916
Attorneys for Plaintiff

By: /s/ Luther Oneal Sutter
Luther Oneal Sutter, ARBN 95031
luther.sutterlaw@gmail.com

By: /s/ Lucien R. Gillham
Lucien R. Gillham, ARBN 99199
lucien.gillham@gmail.com

**CERTIFICATE OF SERVICE**

I, Luther Oneal Sutter, hereby certify that on August ___, 2026, I electronically filed the foregoing Brief in Support of Plaintiff's Motion for Partial Summary Judgment with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to all counsel of record, including:

Sara Monaghan
Arkansas Municipal League
P.O. Box 38
North Little Rock, AR 72115
smonaghan@arml.org

/s/ Luther Oneal Sutter
Luther Oneal Sutter